[Cite as *State v. Fudge*, 2018-Ohio-601.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-821 |
| | | (M.C. No. 2016 TRC 107560) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Shawn Fudge, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 15, 2018

**On brief**: *Richard C. Pfeiffer, Jr.*, City Attorney, *Lara N. Baker*, *Melanie R. Tobias*, *Zachary Gwin*, **and** *Orly Ahroni*, for appellee. **Argued**: *Zachary Gwin*.

**On brief**: *The Koffel Law Firm*, *Bradley P. Koffel*, **and** *Eric E. Willison*, for appellant. **Argued**: *Eric E. Willison*.

APPEAL from the Franklin County Municipal Court

BROWN, P.J.

{¶ 1} This is an appeal by defendant-appellant, Shawn Fudge, from a judgment of conviction and sentence entered by the Franklin County Municipal Court following a jury trial in which he was found guilty of operating a vehicle under the influence of alcohol, and operating a vehicle under the influence of alcohol with a refusal to submit to chemical testing and a qualifying prior conviction within the past 20 years.

{¶ 2} On February 2, 2016, appellant was charged with operating a vehicle under the influence of alcohol ("OVI"), in violation of R.C. 4511.19(A)(1), OVI with a refusal to submit to a chemical test and a prior conviction within 20 years, in violation of R.C. 4511.19(A)(2), and failure to use a turn signal, in violation of R.C. 4511.39. The matter came for trial before a jury beginning September 26, 2016.

{¶ 3} The first witness for plaintiff-appellee, State of Ohio, was Bruce Allen, currently employed by the Ohio State University Police Department. Allen was previously employed as a trooper with the Ohio State Highway Patrol ("OSHP"), and was working in that capacity during the events at issue.

{¶ 4} On February 1, 2016, shortly after midnight, Allen was in a marked OSHP cruiser on Hudson Street when he observed a vehicle driven by appellant. Allen turned onto Interstate 71 and "accelerated at a normal speed" when he noticed appellant's vehicle "was accelerating at a much faster rate than mine." Allen "sped up" to pace appellant's speed, and Allen "had to speed up * * * over 100 miles per hour to catch back up to him." (Tr. at 139.) Allen testified he looked at his speedometer and "we were both going over 90 at that point." (Tr. at 140.)

{¶ 5} Allen initiated a traffic stop of the vehicle, at which time he "detected an odor of an alcoholic beverage coming from the vehicle." Appellant told Allen he was "coming from a birthday party," and "stated that he had consumed some alcoholic beverages." Appellant's "eyes were red" and his "speech was lethargic" or "[s]lurred." (Tr. at 142.) Allen requested appellant exit the vehicle to perform a field sobriety test. Allen performed the horizontal gaze nystagmus ("HGN") test and observed nystagmus in both of appellant's eyes.

{¶ 6} Allen "called for another trooper to come to the scene * * * to proceed with the investigation at this point" because it was his last week of employment with OSHP and he did not want to "take any more cases on for fear of not being available to testify." (Tr. at 150.) A second trooper arrived at the scene of the stop about ten minutes later and agreed to take over the investigation.

{¶ 7} On February 1, 2016, OSHP Trooper Brandi Allen (hereafter "Trooper Brandi") received a dispatch requesting assistance with a traffic stop. When Trooper Brandi arrived at the scene, she was advised by Bruce Allen that he had "stopped the vehicle for a turn signal violation and had to travel at speeds up to a hundred miles per hour in order to catch up to the vehicle." The driver was seated in the rear of Bruce Allen's patrol car; Bruce Allen indicated he had conducted the HGN test on the driver and "observed six clues." (Tr. at 175.) Because the trooper who initiated the stop was "getting ready to leave the highway patrol and go to another agency," the decision was made for

Trooper Brandi to take over the primary duties with respect to the traffic stop. (Tr. at 178.)

{¶ 8} When Trooper Brandi first approached the other trooper's patrol car and opened the door, she "could observe [appellant] had bloodshot, glassy eyes," and she "could smell the odor of an alcoholic beverage coming from the rear of the patrol car." (Tr. at 185.) Trooper Brandi conducted the HGN test on appellant and observed six out of six potential clues.

{¶ 9} Trooper Brandi then had appellant perform the "walk-and-turn" test, which has eight clues. (Tr. at 184.) She testified that the presence of two out of eight clues is a reliable indicator of a blood alcohol content greater than .10. Trooper Brandi observed the presence of five clues during the walk-and-turn test. Specifically, she noted that appellant used his arms for balance, he took an "improper turn on the first nine steps," his first step was "off the line," he stopped on the fourth step, and he took 13 steps instead of 9 as instructed. On the second 9 steps, appellant's first 2 steps "were off the line," and he took a total of 17 steps. (Tr. at 190.)

{¶ 10} Trooper Brandi also instructed appellant to perform the "[o]ne-leg stand test." (Tr. at 191.) Appellant exhibited three out of four clues on this test; specifically, appellant "swayed, used his arms for balance, [and] put his foot down twice." (Tr. at 192-93.) According to Trooper Brandi, the presence of two clues is a reliable indicator of a blood alcohol content above .10.

{¶ 11} Trooper Brandi then instructed appellant to recite the alphabet "from the letter D to the letter X without singing it." (Tr. at 194.) She testified appellant was "unable to say it correctly." (Tr. at 195.) At the time, appellant admitted "he messed up the alphabet." (Tr. at 219.) Following administration of the alphabet test, Trooper Brandi placed appellant under arrest for OVI.

{¶ 12} Trooper Brandi offered appellant a breath test, but he refused to give a sample for testing. She testified she advised appellant of the potential penalties for refusing a breath test based on a prior conviction.

{¶ 13} During its case-in-chief, the state played a video depicting the interaction of the OSHP troopers with appellant, including Trooper Brandi's administration of the field sobriety testing. At trial, the state introduced as Exhibit No. 3 a vehicle inventory/custody report which indicated law enforcement personnel recovered from appellant's vehicle a

"Pike Creek whiskey 750 milliliter filled to [the] shoulder." (Tr. at 218.) Also at trial, the parties stipulated appellant "was previously convicted of operating a vehicle under the influence of alcohol, a violation of Revised Code 4511.19, in Licking County Municipal Court, Case No. 10 TRC 8628, on January 25, 2011." (Tr. at 228.)

{¶ 14} Archie D. Williamson was called as a witness on behalf of appellant. On January 31, 2016, Williamson, who is engaged to appellant's mother, was at the Rumba Café with appellant's mother and appellant. Williamson and appellant's mother arrived at approximately 10:00 p.m., while appellant arrived between 10:15 and 10:30 p.m. During the evening, Williamson observed appellant "have one drink." They also ordered and ate a pizza at the establishment that evening. Williamson and appellant's mother left the Rumba Café between 11:30 and 11:45 p.m. According to Williamson, appellant left about the time "we were pulling out" of the parking lot. (Tr. at 245.) Williamson testified he did not notice any impairment on the part of appellant that evening.

{¶ 15} On cross-examination, Williamson stated when appellant arrived at the Rumba Café he mentioned that he had earlier been at "the casino" for a birthday party. (Tr. at 246.) Williamson estimated that approximately 15 of appellant's friends were at the Rumba Café that evening. Williamson thought he observed appellant with a "mixed drink" at the café. (Tr. at 248.)

{¶ 16} Laverne Blanchard Fudge is appellant's mother. On January 31, 2016, Fudge met appellant at the Rumba Café. She arrived with Williamson around 10:00 p.m., and appellant arrived around 10:15 p.m. Fudge and Williamson left the café that evening around 11:30 p.m., and appellant "walked out the door * * * with us." (Tr. at 251.)

{¶ 17} Fudge testified she observed appellant with "one drink" that evening. (Tr. at 252.) Fudge stated she was with her son the entire time while at the café, and she did not observe anything she thought might indicate her son was impaired. When asked on direct examination whether she would have let her son drive home if she thought there was a chance he was impaired, Fudge responded: "Absolutely, positively not." (Tr. at 271.)

{¶ 18} On cross-examination, Fudge stated that approximately ten of appellant's friends were at the Rumba Café that evening. When asked what appellant was drinking that evening, Fudge described the drink as "brown, had a lot of ice in it, and I kept thinking that thing has got to be watered down because he literally held onto that drink the whole time we were there. He had one drink and he sipped on it the whole time. It

had ice in it." (Tr. at 276.) Fudge stated she was not at the casino with appellant earlier that evening.

{¶ 19} Appellant testified on his own behalf, and stated he was previously employed as a route driver with Culligan Water. On January 31, 2016, prior to going to the Rumba Café, appellant met some friends at the casino; he denied having anything to drink while there. Appellant stated he spent most of the time at the casino "talking to my friend that's sober about how he * * * makes mixed drinks." (Tr. at 287.)

{¶ 20} Appellant left the casino at approximately 9:30 p.m. He then went to the Rumba Café for "about an hour and a half." (Tr. at 287.) Appellant testified that he ate pizza and had one "whiskey Coke." Appellant stated he ordered the drink "before dinner, and * * * really didn't finish it, to be honest. It was basically clear. I mean, all the ice melted. It wasn't really that good by the end of it. Flat pop is not something good to drink." Appellant was with a group of friends, but testified he "spent the majority of the time with [his] mom and Archie." (Tr. at 288.) He stated the band played "three Michael Jackson songs in a row and one of [his] buddies likes Michael Jackson and just moonwalks everywhere. So the only time I really left and hung out with my friend was just to video tape him doing the moonwalk when he was going crazy." (Tr. at 289.)

{¶ 21} Appellant's mother and Williamson left the café "a little before midnight." Appellant, who was living at his mother's residence, left "[a]bout the same time." (Tr. at 289.) On the way home, a trooper stopped his vehicle. When asked if he knew why he was being pulled over, appellant responded: "No. Actually, I pulled over to let him by." (Tr. at 289.) The trooper "said I was speeding. And my response was I never speed. People don't like driving with me because I drive the speed limit." (Tr. at 290.) The trooper asked where he had been, and appellant said he "was leaving Rumba." The trooper asked if he had anything to drink, and appellant "said I had a drink." (Tr. at 291.) Appellant denied the trooper who initiated the stop administered the HGN test with a pen.

{¶ 22} A second trooper arrived and this trooper administered "the eye test." (Tr. at 294.) Appellant stated he told the trooper he had "old contacts and I had astigmatism and I asked her if it was okay if I blink." The trooper instructed appellant to perform the "stand-on-one-leg test." Appellant was wearing "an old pair of cowboy boots" that evening. (Tr. at 296.) Appellant related that he had "two surgeries. I have a metal rod

and I have screws in my knees and screws in my hips." (Tr. at 297.) The trooper administered the alphabet test, and appellant "thought [he] did good." (Tr. at 298.)

{¶ 23} Appellant refused the troopers request to submit to a breath test. He explained he refused the test because "that's what I was told." He also stated that "they're faulty." (Tr. at 299.)

{¶ 24} On cross-examination, appellant was questioned about a bottle of whiskey found in the backseat of his vehicle. Appellant related that he was going to take the whiskey to a friend's house. According to appellant, the friend "likes that whiskey so I was going to give it to him." (Tr. at 304.) Appellant stated that he forgot about the whiskey bottle, and that it had "probably been in there for a couple weeks." (Tr. at 305.) Appellant, who testified he suffered a knee injury in 2010 or 2011, indicated his job delivering salt and water for Culligan Water required him to lift 50 pound bags of salt and water.

{¶ 25} Appellant testified the only reason he had a drink at the Rumba Café "is because I didn't have to pay the cover fee." (Tr. at 310.) Appellant acknowledged that he drinks "socially." (Tr. at 312.) He left the Rumba Café about a "quarter till midnight." (Tr. at 314.) He denied speeding that evening. According to appellant, he did not hear Trooper Brandi instruct him to take nine steps on the walk-and-turn and nine steps back. He acknowledged telling the trooper he understood her questions, and also acknowledged correcting himself during the alphabet test.

{¶ 26} Appellant stated he was told to refuse the breath test from "friends that have been through it and they've talked to their lawyer's. I mean you can't trust it." (Tr. at 331.) He acknowledged having a previous OVI, and he knew that if he refused the test he could lose his license for a longer period of time.

{¶ 27} Following deliberations, the jury returned verdicts finding appellant guilty of both OVI and OVI with a refusal to submit to a chemical test and a prior qualifying conviction within the past 20 years. The trial court made a separate finding of guilty as to the offense of failure to signal.

{¶ 28} By entry filed November 1, 2016, the trial court sentenced appellant to a 180-day jail term, with 160 days suspended. The court also placed appellant on probation for two years.

{¶ 29} On appeal, appellant sets forth the following four assignments of error for this court's review:

> I. The Trial Court erred when it denied the admission of evidence of the death of Appellant's father as bolstering evidence.
> II. The Trial Court erred When It Applied the Wrong Test for Bolstering.
>
> III. The Trial Court Erred When It * * * Found Evidence of the Death of Appellant's Father to be Unfairly Prejudicial.
>
> IV. The State of Ohio committed prosecutorial misconduct during its rebuttal to the Appellant's closing argument and the Trial Court erred in ignoring the Appellant's counsel's protests about this.

{¶ 30} Appellant's first, second, and third assignments of error are interrelated and will be considered together. Under these assignments of error, appellant argues the trial court erred in: (1) declaring evidence of his father's death inadmissible as bolstered evidence, (2) utilizing the wrong test for bolstering, and (3) finding evidence of his father's death to be unfairly prejudicial.

{¶ 31} By way of background, during the direct examination of appellant's mother, Laverne Fudge, the state objected to an inquiry by defense counsel regarding appellant's father. Outside the hearing of the jury, the state indicated the objection was based on the anticipation that "this line of questioning is directing this witness toward the fact that the defendant's father passed away in an OVI accident." (Tr. at 253.) Defense counsel responded the prosecutor "is right, that is where it's going," but argued that such evidence was relevant to demonstrate why appellant's mother "is going to pay attention" to how much alcohol her son had at the bar on the evening in question because of concern about "what happened with her husband." (Tr. at 253, 254.) Defense counsel further argued it was "extremely important for her to be able to add to her credibility." (Tr. at 254.)

{¶ 32} In response, the state argued that defense counsel was seeking to bolster the credibility of the witness "in a way that is way more prejudicial than probative." (Tr. at 254.) The state requested a motion in limine to preclude the witness from testifying as to "the OVI-related death in her family." (Tr. at 257.)

{¶ 33} The trial court, in addressing the respective arguments, stated that "the ultimate test" is whether the testimony "is * * * more prejudicial than probative." (Tr. at

261.)   Outside the presence of the jury, counsel for appellant questioned appellant's mother on voir dire.  Fudge testified that she had been married to Lamar Fudge for "about four years," and that he "was killed while driving and drinking because his friend let him leave a party after he had been drinking."  Fudge further testified: "I would never let any of my sons, as long as they were with me anywhere, leave if I thought they had been drinking and could not drive because I would not want to sit at a funeral and hold his baby while he's in a casket like I had to hold my children because my husband died because somebody let him leave a party.  So, no, I would not let him drive."  (Tr. at 262.)

{¶ 34}  Following voir dire of the witness, the court stated it was required to "weigh whether that is too prejudicial to be addressed in the way it was addressed on the stand." (Tr. at 263.)   After entertaining arguments from both sides, the trial court sustained the state's objection, ruling that it was "going to disallow specifics." The court elaborated that the witness "can testify as to what she observed.  She can testify as to her beliefs that it would be inappropriate for him to leave if he were intoxicated.  But as to the specifics of a personal loss directly related to this charge, the Court is going to disallow that testimony." (Tr. at 268.)  Fudge subsequently testified before the jury on direct examination (as noted under the facts) that she would not have let her son drive home if she thought there was a chance he was impaired.

{¶ 35}  Appellant contends defense counsel's attempt to elicit testimony by appellant's mother that her husband died as a result of drinking and driving did not implicate impermissible bolstering; according to appellant, a witness' explanation as to why they paid special attention to a matter most people might view as trivial is not bolstering.   Appellant contends the trial court should have analyzed any claim of bolstering based on a definition from Black's Law Dictionary, defining the term bolstering as "when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party."  *Black's Law Dictionary* 176 (6th Ed.1990).

{¶ 36} Appellant argues the trial court improperly applied an Evid.R. 401 (relevance) versus Evid.R. 403 (probative value versus unfair prejudice) analysis to determine whether the evidence constituted improper bolstering.  Appellant further argues that, to the extent the trial court performed such an analysis, the evidence was not unfairly prejudicial, citing this court's decision in *State v. Urbina,* 10th Dist. No. 15AP-

978, 2016-Ohio-7009, ¶ 28 (finding abuse of discretion by trial court in precluding witness from testifying about suffering a miscarriage immediately after car accident, as witness's testimony regarding her actions the night of the accident would have aided the jury in assessing her credibility, and the danger of unfair prejudice would not have outweighed its probative value under Evid.R. 403).

{¶ 37} In response, the state argues that, because the trial court excluded the evidence on the basis of Evid.R. 403(A), appellant's argument that the excluded evidence did not constitute improper bolstering is immaterial. The state further maintains the trial court properly excluded the evidence as unduly prejudicial under Evid.R. 403(A).

{¶ 38} As noted, appellant's counsel argued at trial that the testimony at issue was relevant in explaining why appellant's mother paid close attention to how much alcohol her son consumed at the café, and that its admission would "add to her credibility." In reviewing the trial court's ruling, we are cognizant the court did not preclude the witness from testifying as to the amount of alcohol she observed her son consume (or as to "her beliefs that it would be inappropriate for him to leave if he were intoxicated") but, rather, limited the testimony to exclude evidence relating to her husband's alcohol-related death several years earlier. In general, "Evid.R. 403(A) favors the admissibility of evidence," and relevant evidence "should be viewed in a light most favorable to the proponent, in effect maximizing its probative value and minimizing any prejudicial effect." *State v. Chaney,* 4th Dist. No. 01CA41, 2002-Ohio-2605, ¶ 15, citing *State v. Maurer,* 15 Ohio St.3d 239, 265 (1984). In our view, the excluded evidence could have assisted the trier of fact in assessing the mother's testimony, and we do not agree with the trial court's conclusion that its admission was so prejudicial as to render it inadmissible. However, while we believe the trial court erred in excluding the subject testimony, we find the error to be harmless.

{¶ 39} Under Ohio law, "an accused has 'a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error.' " *State v. Tucker*, 12th Dist. No. CA2010-10-263, 2012-Ohio-139, ¶ 17, quoting *State v. Swartsell*, 12th Dist. No. CA2002-06-151, 2003-Ohio-4450, ¶ 31. Pursuant to Crim.R. 52(A), "any error, defect, irregularity or variance that does not affect the accused's substantial rights shall be disregarded as harmless error." *Tucker* at ¶ 17. In this respect, "[a] finding of harmless error is appropriate where there is 'overwhelming evidence of guilt' or 'some other indicia

that the error did not contribute to the conviction.' " *Id.,* quoting *State v. Sims,* 12th Dist. No. CA2007-11-300, 2009-Ohio-550, ¶ 34. *See also State v. Irby,* 11th Dist. No. 2015-Ohio-5467, ¶ 96, citing *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 29 ("Error is harmless when the remaining evidence of guilt is overwhelming.").

{¶ 40} An error by the trial court in excluding evidence "is harmless 'if such evidence would not negate the overwhelming proof of defendant's guilt.' " *State v. Johnson,* 3d Dist. No. 9-10-47, 2011-Ohio-994, ¶ 64, quoting *State v. Gilmore,* 28 Ohio St.3d 190, 193 (1986). *See also State v. Smith,* 3d Dist. No. 8-12-05, 2013-Ohio-746, ¶ 20 ("The improper exclusion of evidence is harmless where the remaining evidence provides overwhelming proof of a defendant's guilt."); *State v. West,* 10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 9 (noting that an "appellate court will not reverse a judgment for improper exclusion of evidence on a basis of error that is harmless," and that "error is harmless if the jury would not have rendered a different verdict had the excluded evidence been admitted at trial").

{¶ 41} In the present case, any error by the trial court in excluding the testimony at issue was harmless based on overwhelming evidence of appellant's intoxication. At trial, the state presented extensive evidence as to the troopers' observations of appellant at the time of the stop, including his performance on the field sobriety tests. Bruce Allen testified he paced appellant's vehicle as traveling "over 90" m.p.h. prior to initiating the stop. Following the stop, and upon approaching appellant's vehicle, the trooper detected an odor of alcohol. Appellant told the trooper he was "coming from a birthday party," and that he "had consumed some alcoholic beverages." The trooper noted appellant's "eyes were red" and his speech was "[s]lurred." The trooper performed the HGN test and observed nystagmus in both of appellant's eyes.

{¶ 42} Trooper Brandi arrived shortly after the traffic stop and conducted a number of field sobriety tests. She could smell the odor of alcohol from where appellant was seated in the patrol car, and observed appellant had bloodshot, glassy eyes. Trooper Brandi administered the HGN test on appellant and observed six out of six clues for nystagmus. She next administered the walk-and-turn test, in which the presence of two out of eight clues is a reliable indicator of impairment. On the walk-and-turn test, appellant exhibited five out of eight clues; specifically, appellant used his arms for

balance, stepped off the line, took an improper turn, stopped on the fourth step and took 13 steps forward (instead of 9) and 17 steps back (instead of 9).

{¶ 43} Trooper Brandi administered the one-leg stand test, in which the presence of two out of four clues is a reliable indicator of impairment. Appellant exhibited three out of four clues as he swayed, used his arms for balance, and twice put his foot down. Trooper Brandi also administered the alphabet test, and appellant was "unable to say it correctly." (Tr. at 195.) Appellant refused to take a breath test, despite Trooper Brandi informing him that he faced a two-year suspension based on a prior conviction. She also found a whisky bottle, filled to the shoulder, in appellant's vehicle. Further, the jury had the opportunity, based on the state's introduction of video from the patrol cars, to view the troopers' interaction with appellant, including Trooper Brandi's administration of the field sobriety tests.

{¶ 44} Here, even if the excluded testimony (as to the death of Laverne Fudge's husband) had been admitted, such evidence would not have negated the overwhelming proof of appellant's guilt which included, as cited above, evidence as to appellant's operation of his vehicle at over 90 m.p.h., the troopers' detection of the odor of alcohol, glassy eyes, slurred speech, appellant's admission that he had been drinking, the testimony of the troopers that he failed all field sobriety tests administered (i.e., the HGN test, the walk-and-turn test, the one-leg stand test, and the alphabet test), the discovery of a whiskey bottle in his vehicle, and his refusal to submit to a breath test. *See, e.g.*, *Bedford Heights v. Nieminen*, 8th Dist. No. 71826 (Nov. 20, 1997) (while it may have been error for trial court to exclude testimony by defendant's expert, such exclusion was not prejudicial because of overwhelming evidence of defendant's intoxication, including evidence that officer noted strong odor of alcohol, slurred speech, and glassy eyes, and that defendant failed to adequately perform field sobriety tests and refused to submit to breath alcohol test). Because the state presented overwhelming evidence of appellant's intoxication, any error by the court in excluding the testimony at issue was harmless beyond a reasonable doubt.

{¶ 45} Accordingly, appellant's first, second, and third assignments of error are without merit and are overruled.

{¶ 46} Under the fourth assignment of error, appellant contends the prosecutor engaged in misconduct during closing argument by attacking the credibility of Laverne

Fudge. Appellant points to a comment by the prosecutor that Williamson and Fudge "obviously had talked about this during the six months that happened in the meantime." According to appellant, the prosecutor's comment suggests these witnesses were colluding. Appellant also challenges a statement by the prosecutor regarding Fudge's testimony that she recalled "looking at that glass. There was a lot of ice in that glass." The prosecutor further stated: "I ask you the last time you can remember when you were at a bar you ever paid attention to how much ice was in a person's glass they were drinking?" (Tr. at 362.)

{¶ 47} Under Ohio law, "[t]he test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Jackson,* 92 Ohio St.3d 436, 441 (2001), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24 (1987). In analyzing whether a defendant has been deprived of a fair trial, "an appellate court must determine whether, absent the improper remarks, the jury would have found the appellant guilty beyond a reasonable doubt." *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.). In determining if "alleged misconduct resulted in prejudice, we must consider ' "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." ' " *Id.*, quoting *State v. Tyler*, 10th Dist. No. 05AP-989, 2006-Ohio-6896, ¶ 20, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

{¶ 48} The test for prosecutorial misconduct in closing arguments is whether "the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith,* 14 Ohio St.3d 13, 14 (1984). In general, "prosecutors are entitled to considerable latitude in closing argument." *State v. Muhleka*, 2d Dist. No. 19827, 2004-Ohio-1822, ¶ 85, citing *State v. Ballew,* 76 Ohio St.3d 244, 255 (1996). During closing argument, "a prosecutor may comment freely on ' "what the evidence has shown and what reasonable inferences may be drawn therefrom." ' " *Id.*, citing *State v. Lott*, 51 Ohio St.3d 160, 165 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). Furthermore, " 'because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced.' " *Id.*, quoting *State v. Stevens*, 2d Dist. No. 19572, 2003-Ohio-6249, ¶ 34.

{¶ 49} In the present case, appellant did not object to the comments he now claims were improper. In cases where a defendant "fails to object to the prosecutor's alleged misconduct, he waives all but plain error." *Wellston v. Horsley*, 4th Dist. No. 05CA18, 2006-Ohio-4386, ¶ 22, citing Crim.R. 52; *State v. Hartman*, 93 Ohio St.3d 274, 294 (2001). Notice of plain error, pursuant to Crim.R. 52(B), "is to be taken with the utmost of caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* Further, "[p]lain error should not be invoked unless it can be said that, but for the error, the outcome of the trial would clearly have been otherwise." *Id.*

{¶ 50} As noted, appellant points to the prosecutor's comment that Williamson and Fudge had "talked about this during the six months that happened in the meantime." (Tr. at 362.) However, during cross-examination of Williamson, when questioned whether appellant had discussed what happened "after he got picked up by yourself and Laverne," Williamson responded: "He discussed it. We - - Yes, he discussed it." (Tr. at 249.) Thus, the prosecutor's remark appears to have been a fair comment on the record, and no plain error occurred.

{¶ 51} Appellant also challenges the prosecutor's statement that appellant's mother, Fudge, testified as to observing a lot of ice in appellant's glass. As noted by the state, however, Fudge acknowledged during cross-examination that she did not know what type of drink her son was consuming. During closing argument, the prosecutor cited testimony by Fudge that she did not see appellant purchase the drink, and she "didn't see the drink poured." The prosecutor argued that if Fudge and Williamson "didn't see that, it's certainly possible they didn't see another drink that was purchased." (Tr. at 363.) In context, we find the statement was arguably a fair comment on the evidence. Even if not a fair comment, though, we cannot conclude the outcome of the trial would have been different absent the prosecutor's remarks.

{¶ 52} We further note the trial court instructed the jury the evidence did not include "opening statements or closing argument of counsel or any other statement made by counsel during trial," and that "[o]pening statements and closing arguments are designed to assist you but they are not evidence." (Tr. at 366.) It is presumed that "the jurors followed these instructions and that the verdict was not, therefore, based on the content of the closing arguments." *State v. Thompson*, 3d Dist. No. 7-16-10, 2017-Ohio-792, ¶ 26, citing *Pang v. Minch,* 53 Ohio St.3d 186, 187 (1990).

{¶ 53} Accordingly, appellant's fourth assignment of error is not well-taken and is overruled.

{¶ 54} Based on the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Municipal Court is hereby affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____