[Cite as *State v. Penland*, 2023-Ohio-806.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                                 No. 111531

    v.                                       :

CORNEL PENLAND,                  :

    Defendant-Appellant.       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 16, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-664532-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Amanda Hall, Assistant Prosecuting Attorneys, *for appellee.*

The Pattakos Law Firm LLC and Peter Pattakos, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Cornel Penland ("Penland"), appeals from his conviction and sentence following a jury trial. He raises the following assignments of error for review:

1. Defendant's conviction for rape was based on legally insufficient evidence.

2. Defendant's conviction for rape was against the manifest weight of the evidence.

3. The trial court violated defendant's Sixth Amendment right to confront his accuser by denying defense counsel the opportunity to ask the accuser highly relevant and probative questions about her failure to appear for the originally scheduled trial on the charges, and insisting the jury make an unwarranted inference about his failure.

4. Trial counsel provided ineffective assistance to defendant in violation of the Sixth Amendment.

5. The trial court erred by permitting prosecutorial misconduct in the form of an extremely inflammatory and prejudicial closing argument.

{¶ 2} After careful review of the record and relevant case law, we affirm Penland's conviction and sentence.

## I. Procedural and Factual History

{¶ 3} On April 12, 2019, a three-count indictment was filed against "John Doe #149" in Cuyahoga C.P. No. CR-19-638882-A, alleging that the unidentified suspect committed two counts of rape in violation of R.C. 2907.02(A)(2), and a single count of aggravated robbery in violation of R.C. 2911.01(A)(3). The indictment stemmed from the sexual assault of the victim, N.D., on or about October 25, 2001.

{¶ 4} On February 17, 2021, the indictment was amended to delete the reference to "John Doe #149" and to insert "Cornel Penland." Ultimately, however, the case was dismissed without prejudice because "the state [was] unable to secure the presence of victim/witness."

**{¶ 5}** On October 22, 2021, Penland was reindicted in Cuyahoga C.P. CR-21-664532-A. The indictment contained identical language, charging Penland with two counts of rape in violation of R.C. 2907.02(A)(2), and a single count of aggravated robbery in violation of R.C. 2911.01(A)(3). The matter proceeded to a jury trial on March 7, 2022, where the following evidence was adduced.

**{¶ 6}** N.D. was 39 years old at the time of trial. When N.D was 19-years old, she worked as an exotic dancer in a night club, the First Page Lounge, located in Cleveland, Ohio. On October 24, 2001, N.D. worked between the hours of 8:00 p.m. and 2:30 a.m. and earned approximately $300-350 in cash. N.D. stored her money inside a purple Crown Royal bag and planned to use the money to pay rent.

**{¶ 7}** At the end of her shift, N.D. was waiting for a cab when an unidentified man offered her a ride home. N.D. accepted the invitation and entered the back seat of the vehicle, where a second unidentified man was sitting. Once N.D. was secured inside the vehicle, a third man, later identified as Penland, entered the vehicle and sat beside N.D. in the back seat. N.D. assumed the men had frequented the night club that evening. However, she was not familiar with any of the men and had never seen them before.

**{¶ 8}** According to N.D., the men did not transport her home as agreed upon. Instead, N.D. was transported to a secluded alleyway, where she was vaginally raped. N.D. was unable to recall specific details of the sexual assault, but summarized the incident as follows:

Um, I can't remember too much because it was 20 years ago, but I'll just tell you what I remember. When we got there it was on a back street. I just remember getting raped. I don't remember if it was one or two guys. I know the driver said, "No, I ain't in that" and that's that.

(Tr. 231.) Relevant to this appeal, subsequent DNA testing confirmed that Penland engaged in sexual intercourse with N.D. on the night in question.

{¶ 9} N.D. testified that she did not attempt to fight off her assailants because she was outnumbered and frightened. N.D. clarified that she was forced to engage in vaginal intercourse and that she did not want to have sex with the strange men. She further denied any insinuations that she was paid for sex that evening. N.D. suffered significant emotional trauma as a result of the incident and felt that the assailants had taken "a part of [her]." (Tr. 244.) She had trouble sleeping, "stopped dancing altogether," and participated in individual therapy for approximately five years. (Tr. 295-296.)

{¶ 10} When the sexual assault concluded, Penland took N.D.'s bag of money and told her to get out of the vehicle. N.D. resisted and was dragged "down the street by the car" before she eventually let go of her bag and fell from the vehicle. N.D. was confident that Penland was the individual that took her bag, stating, "I'm telling you the person that raped me snatched my bag and he's the reason I got dragged behind the car." (Tr. 277.) N.D. was left stranded in the alleyway wearing only a shirt and her bra. N.D. did not recall what happened to the rest of her clothing. Thereafter, N.D. located a pay phone and called her friend, Catherine Williams ("Williams"), for a ride home. N.D. was living with Williams and Lawrence Taylor ("Taylor") at the

time of the incident. N.D. viewed Williams and Taylor as parental figures and referred to them as "mommy" and "daddy."

{¶ 11} N.D. was subsequently taken to the hospital for medical treatment. Photographs were taken of her substantial injuries, which included a missing tooth, a bloody mouth, and abrasions on her shoulders, elbow, fingers, hands, legs, chin, and feet. N.D. also suffered vaginal inflammation and swelling. N.D. spoke with a Sexual Assault Nurse Examiner ("SANE nurse") and a rape kit was collected.

{¶ 12} On cross-examination, N.D. was questioned at length about the events leading up to the incident, her prior statements to investigators and medical personnel, and her conduct following the alleged sexual assault. N.D. conceded that she was uncooperative with the investigation into her sexual assault by missing appointments with Cleveland police detectives in 2001. N.D. explained that she was unresponsive because she "wanted to move on with [her] life." (Tr. 294.) Regarding the identity of her assailants, N.D. further confirmed that, contrary to her testimony at trial, she previously told investigating officers and medical personnel that only two men were present at the time of her sexual assault. Nor could N.D. recall whether it was one or two men that raped her. N.D. similarly testified that she did not recognize Penland in the courtroom, did not know him personally, and did not recall meeting him on the night in question. N.D. stated, however, that she was certain Penland was her assailant based on the DNA evidence and the information gathered in preparation for trial. (Tr. 261, 296.)

{¶ 13} With respect to N.D.'s conduct after the incident, N.D. testified that she did not immediately contact the police or go to the hospital. Although N.D. could not remember whether she walked home or got a ride from Williams, she agreed that she returned to Williams's home and immediately went to sleep. The following morning, N.D. had no intention of seeking medical treatment or filing a police report because "she wanted it to be over," and needed to be able to work and pay her rent. N.D. agreed that "making rent money was more important at that time" because she had "been homeless for a long time and [did not] want to go back." (Tr. 285.) Nevertheless, N.D. was later transported to the hospital by Williams after Williams and Taylor noticed the extent of N.D.'s injuries.

{¶ 14} Additionally, N.D. confirmed that she threw away the clothes she was wearing at the time she was discarded from the assailants' vehicle and the nightgown she changed into when she returned home. When asked why she destroyed potential evidence, N.D. explained as follows:

> The time when it happened you're not thinking rationally. You thinking I don't want no part of this. I want to heal up. * * * I just want to go back to normal you know. I'm not thinking about who needs my bloody items and this and that.

(Tr. 283.) Finally, N.D. freely admitted that, when she was younger, she accepted money for sex on numerous occasions. So much so that she was not willing "to put a number to it." (Tr. 280-281.) Nevertheless, N.D. was adamant that no money was exchanged for sex on the night in question.

{¶ 15} Bonnie Schuerger ("Schuerger") testified that in 2001, she was employed by University Hospitals Bedford Medical Center as a SANE nurse. Schuerger thoroughly described her role as a SANE nurse and the protocols in place for the examination of patients who have been sexually assaulted. Relevant to this appeal, Schuerger confirmed that she treated N.D. on October 25, 2001. Schuerger testified that N.D. was visibly "traumatized" and had readily observable injuries. (Tr. 383.) In the course of her medical examination, Schuerger obtained a narrative history, completed a "head to toe" physical examination, took photographs of N.D.'s injuries, and administered a rape kit. N.D.'s narrative, which was admitted as state's exhibit No. 32, stated, in pertinent part:

> I was at the club First Page. It was close to the end and I didn't have no ride. I asked him to give me a ride home. He said ya. When we got to the car, we left and he detoured off 55th and he parked the car. There was another guy waiting. I got out the front and he told me to get in the back because he wanted to take his friend home. He was, they was both asking me questions like, "what's up, what's up?" I said "I have to go home." So he told his friend to get in the back, and he got in the back on the other side of me. So they started not attacking, I guess it would be attacking. Ok in this attack, it was like he started taking my clothes off, and I said, "no stop." So they kept on, the driver had a rubber and he started doing it to me. The other guy was like here, "[give me oral sex]," and I said "no." So, I was afraid. I did it. Then after that was over they switched. When they switched, after it was over and I was crying. I was looking for my clothes and stuff and when I looked up the passenger was hitting me in the face. He snatched my money bag from dancing all night and pushed me out the car while the car was moving. I just got my pants that they threw out the window and proceeded to walk home. My shoes, coat, and dance outfit were still in the car. I went in the house and took off my clothes, and they were bloody. I put on my nightgown on and * * * went to sleep. I woke up the next morning and my mother and father, they didn't know. My dad spotted it first and said "let me see your leg and told my mother to take me to

the hospital. 9:20 a.m. [I] went to St. Michael's. Then mom brought me here.

{¶ 16} Detective Ronald James ("Det. James") of the Cleveland Police Department testified that in 2001, he was serving as a patrol officer. On October 25, 2001, Det. James responded to a dispatch advising him that a victim of a sexual assault had been transported to St. Michael's Hospital for a medical examination. Det. James testified that when he arrived at the hospital, N.D. was "visibly shaken and upset" and had "bruises and abrasions" on her knees. (Tr. 347.) After speaking with N.D., Det. James learned that she was sexually assaulted by two men after working a shift "as a dancer at the First Page Lounge." (Tr. 352.) N.D. further indicated to Det. James that the men had taken a purple Crown Royal bag that contained her tip money, a Tommy Hilfiger backpack, and various items of clothing. The incident occurred between 2:30 and 3:00 a.m. at a location "south of East 55th and I-490." (Tr. 349.) N.D. provided a description of each assailant and the vehicle they were driving. Det. James testified that the information gathered during his interview with N.D. was memorialized in a written police report. Det. James subsequently canvassed the area where the incident was alleged to have occurred in an attempt to recover N.D.'s clothing and personal items. His efforts, however, proved unsuccessful.

{¶ 17} Williams testified that N.D. lived with her at the time of the incident and paid approximately $100 per week in rent. On October 25, 2011, Williams was awoken by a phone call from N.D. at approximately 4:00 a.m. N.D was crying and

stated that somebody had "robbed her and raped her and took her money." (Tr. 449.) At some point thereafter, N.D. came home, and Williams encouraged her to go to the hospital "so she could get checked out" and preserve evidence. (Tr. 449.) Williams testified that N.D. appeared emotionally "devastated" and had visible injuries on her face and legs. (Tr. 450.)

{¶ 18} On cross-examination, Williams stated that she did not know whether N.D. walked home after the incident or whether she was given a ride. And, contrary to N.D.'s testimony, Williams testified that N.D. did not go to sleep before she was taken to the hospital. Williams further stated that, although N.D. "looked terrible," she was wearing pants and a shirt at the time she arrived at Williams's home. (Tr. 463-464.)

{¶ 19} Heather Bizub ("Bizub"), a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified that N.D.'s rape kit was submitted for DNA testing on March 21, 2003. At that time, BCI conducted a forensic analysis of the vaginal slides and swabs contained in N.D.'s rape kit. Bizub confirmed that a semen sample was recovered from the vaginal swab. The semen sample contained a DNA mixture that was consistent with the victim and an unknown male. Bizub explained that because the identity of the male DNA was unknown, BCI isolated a DNA profile for the unknown male that was suitable for future comparisons. (Tr. 488.)

{¶ 20} In July 2017, N.D.'s rape kit was resubmitted to BCI for further analysis. On this occasion, BCI performed additional DNA testing on other items contained in the rape kit, including rectal swabs, pubic hair combings, and cuttings

of N.D.'s underwear. Bizub testified that these materials contained the same DNA profile as the male DNA recovered from the vaginal swabs in 2003. Bizub further confirmed that the identity of the unknown male DNA was still not known at the time BCI conducted additional testing in 2017.

{¶ 21} Alan Strickler ("Investigator Strickler"), a former investigator for the Cuyahoga County Prosecutor's Office, testified that he was assigned to investigate N.D.'s case while working in the cold-case unit. In October 2018, Investigator Strickler separately interviewed N.D. and Williams in October 2018. Ultimately, however, no suspects were identified while Investigator Strickler was assigned to the case.

{¶ 22} Sonya Dziuba ("Investigator Dziuba"), an investigator for Cuyahoga County Prosecutor's Office, testified that she was assigned to investigate N.D.'s case in August 2020. Investigator Dziuba explained that the follow-up investigation was initiated after the sexual-assault unit received an investigative lead linking Penland to N.D.'s case. Investigator Dziuba then contacted N.D., who was living in Texas at the time, and obtained her approval to move forward with the investigation. With the assistance of the San Antonio Police Department, N.D. was shown a photo array on September 3, 2020. The photo array contained an image of Penland and images of five other individuals with similar physical characteristics. When N.D. was presented with the photo array by a blind administrator, she circled the photograph of an individual who was not Penland.

{¶ 23} Investigator Dziuba subsequently learned that Penland was living in Georgia. Accordingly, Investigator Dziuba contacted a sexual-assault kit initiative group located in Atlanta, Georgia, that was "willing to assist [Investigator Dziuba] in contacting [Penland] and conducting an interview." (Tr. 527.) The investigators in Georgia were provided with pertinent materials, including the original police report, a photograph of N.D. near the time of the incident, and a Google map image depicting the location of the First Page Lounge, the area where the assault was alleged to have occurred, and Penland's last known address.

{¶ 24} James Spear ("Investigator Spear") testified that he is employed by the Fulton County District Attorney's Office in Atlanta, Georgia, and serves as an investigator in the Sexual Assault Kit Initiative Task Force. Investigator Spear testified that on September 16, 2020, his unit was contacted by the Cuyahoga County Prosecutor's Office in relation to this case. Investigator Spear was subsequently "provided with a case file which contained the original police report from the Cleveland Police Department and also contained the supplemental report from the Cuyahoga County Prosecutor's Officer." (Tr. 303-304.) Investigator Spear explained that the investigative lead linking Penland to N.D.'s case related to "a letter from the Georgia Bureau of Investigations that was notifying the Ohio Bureau of Investigations of a DNA match in this case." (Tr. 319.) After familiarizing himself with the case file, Investigator Spear ran Penland's name through a database and confirmed that he was living Covington, Georgia.

{¶ 25} On November 16, 2020, Investigator Spear conducted a recorded interview with Penland, who was accompanied by counsel, regarding his familiarity with N.D. and his whereabouts on October 25, 2001. During the interview, Penland provided background information, including his place of residence, employment history, and marital status. Penland stated that he moved from Ohio to Georgia in 1998, but often returned to Cleveland, Ohio to visit friends and family. Penland denied ever visiting the First Page Lounge and indicated that he did not spend time near the general area of East 55th Street. In addition, when presented with a photograph of N.D. that was taken near the time of the incident in 2001, Penland denied knowing N.D. and expressed that he had never seen her before.

{¶ 26} During the course of the interview, Investigator Spears recounted the specific nature of N.D.'s allegations and asked Penland to explain the presence of his DNA. Penland vehemently denied ever forcing himself on a woman and stated that if he did have sexual conduct with N.D., it was consensual. He continued to reiterate, however, that he had no recollection of meeting N.D. in 2001. Penland further denied having any friends that matched the description of the other men alleged to have been involved in the incident. Finally, Penland had no recollection of why he would have been in Cleveland, Ohio in October 2001. At the conclusion of the interview, Investigator Spear obtained Penland's written consent to conduct a buccal swab extraction for additional forensic testing.

{¶ 27} On December 11, 2020, Penland's buccal swab was submitted to BCI for forensic analysis. Penland's DNA standard was then compared to the unknown

male DNA profile recovered from N.D.'s rape kit. Bizub testified that Penland's DNA sample was consistent with the DNA profile from the rape kit. Bizub explained that the probability of finding another individual with the same DNA profile was "rarer than one in one trillion unrelated individuals." (Tr. 502.)

{¶ 28} At the close of the state's case, Penland made a Crim.R. 29 motion for acquittal, arguing that the evidence demonstrated that his sexual encounter with N.D. was consensual. After careful consideration, the trial court granted the motion as to Count 2 of the indictment but denied the motions as to all remaining claims. (Tr. 566.)

{¶ 29} Penland testified on his own behalf. Penland, who was 54 years old at the time of trial, was born and raised in Cleveland, Ohio. In 1991, Penland began working as a firefighter in the city of East Cleveland. He served as a firefighter in East Cleveland for approximately seven years before moving to Georgia in 1998. Penland testified that he continued working as a firefighter in Georgia, and also began appraising homes on a part-time basis. Penland frequently returned to the Cleveland area after he moved to Georgia to visit friends and family.

{¶ 30} On direct examination, Penland was questioned at length regarding his initial contact with Investigator Spears and the interview that occurred on November 16, 2020. Penland recounted his answers during the interview and expressed that he genuinely did not recognize the victim or recall the incident "because it was 20 years ago." (Tr. 612.) Penland characterized the interview as follows:

So [Investigator Spears] is giving me this information, I'm trying to recall you know the stuff that he's giving me or not and I have no recollection of any of this.

So, then he's — he's assertive as far as, you know, making it seem like I'm holding back information from him but I didn't hold anything back because I didn't know — I really didn't know what he was referring to or trying to, you know, ask me questions about.

(Tr. 614-615.)

{¶ 31} After leaving the interview with Investigator Spears and having an opportunity to reflect, Penland recalled that he had, in fact, visited the Front Page Lounge with a friend and former colleague, Kevin Chambers ("Chambers"), in 2001. Furthermore, Penland recalled that he had, in fact, had sex with a stripper on the night in question. Penland testified that Chambers arranged and paid for N.D. to have sex with him and Penland.

{¶ 32} Penland explained that he and Chambers were socializing in the night club when Chambers suddenly stated that one of the strippers was willing to engage in sex with them in exchange for money. Penland testified that he did not personally pay money for sex but observed Chambers "hand some money to one dancer." (Tr. 601.) At approximately 11:30 or 12:00 p.m., Penland exited the night club and entered his rental car. Penland testified that he was sitting in the driver's seat and that Chambers and N.D. got into the back seat. Chambers and N.D. briefly engaged in small talk before having sex in the back seat. Penland remained in the driver's seat while the sexual conduct occurred to "mak[e] sure no one walked up on the car." (Tr. 602.) After approximately ten minutes, Chambers finished and N.D. asked

Chambers, "is your boy coming[?]" (Tr. 603.) At that time, Penland switched spots with Chambers and engaged in vaginal sex with N.D. Penland stated that he used a condom but that it broke during sex. Penland testified that he did not converse with N.D. and did not notice a purple Crown Royal bag. Penland further stated that N.D. exited the vehicle without incident. He did not notice any injuries on her person and did not recall her "being dragged or anything of that nature." (Tr. 608.)

{¶ 33} Throughout his testimony, Penland vehemently denied raping N.D. and maintained that the sexual encounter was consensual. He further denied taking any money or personal belongings from N.D. (Tr. 618-619.)

{¶ 34} At the conclusion of trial, Penland was found guilty of rape in violation of R.C. 2907.02(A)(1), a felony of the first degree, as charged in Count 1 of the indictment. Penland was found not guilty of aggravated robbery as charged in Count 3 of the indictment.

{¶ 35} On April 20, 2022, Penland filed a motion for a new trial, arguing that (1) his Sixth Amendment right to conflict-free counsel was violated where defense counsel concealed his imminent suspensions from the practice of law, and (2) the jury could not have reasonably concluded from the trial record that the prosecution proved the offense of rape beyond a reasonable doubt.

{¶ 36} On May 4, 2022, the trial court sentenced Penland to a three-year, mandatory term of imprisonment on the rape offense. Upon sentencing Penland, the trial court proceeded directly to a hearing on the pending motion for a new trial.

At the conclusion of the hearing, the trial court issued a journal entry denying

Penland's motion for a new trial, stating, in relevant part:

> As to actual conflict in legal representation, defendant presents no support. Fact-finding, making inferences and assessing the credibility of witnesses are jury functions. Based upon the evidence in this case, the jury found defendant guilty of rape in Count 1, not guilty of robbery in Count 3. Count 2, rape was dismissed on a Crim.R. 29 motion due to insufficient evidence. The court determines that there is no basis to grant a motion for new trial. While still on active status as an attorney, Samuel Smith conducted and was afforded full discovery and appeared at all pretrials. Whether Smith's trial representation is deemed ineffective will be subject to appellate review and as well as an analysis of whether the jury's verdict of guilt is supported by the manifest weight of the evidence. Defendant fails to establish any cause to grant a motion for new trial. Accordingly, defendant's motion for new trial is denied.

{¶ 37} Penland now appeals from his conviction and sentence.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 38} In the first assignment of error, Penland argues his rape conviction is based on legally insufficient evidence.

{¶ 39} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273,

574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 40} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence is not only sufficient, ""but may also be more certain, satisfying, and persuasive than direct evidence.'"" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 41} In this case, Penland was convicted of rape in violation of R.C. 2907.02(A)(2). The statute provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 42} R.C. 2901.22(A) provides that "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in

conduct of that nature." In turn, "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 43} "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. "Ohio Supreme Court case law demonstrates that the type and amount of force necessary to purposefully compel a victim to submit 'by force or threat of force' depends upon the victim and offender's relationship." *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 41. "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus. "'As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Id.* at 59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

{¶ 44} Under Ohio law, "[a] victim need not prove physical resistance to the offender in prosecutions under [the statute]." R.C. 2907.02(C). Thus, "there is no requirement under Ohio law that a victim resist in order for a defendant's act to be forceful." *State v. Poole*, 8th Dist. Cuyahoga No. 107829, 2019-Ohio-3366, ¶ 33.

{¶ 45} On appeal, Penland does not dispute that he engaged in sexual conduct with the victim. Nevertheless, Penland argues the evidence is insufficient to demonstrate that he purposely compelled N.D. to submit to the sexual conduct by force or threat of force, as is required to sustain a conviction under R.C. 2907.02(A)(2). Specifically, Penland contends that there is no evidence from which the trier of fact could "infer that [N.D.'s] fear was based on some wrongful action or conduct of the defendant that purposely compelled her to submit to the sexual conduct, against her will." Penland further suggests that there is no objective evidence that he "intended to force, threaten, or compel N.D. to engage in sexual conduct."

{¶ 46} After careful consideration, we disagree with Penland's interpretation of the testimony adduced at trial and find the state presented sufficient evidence to support the jury's verdict. In this case, N.D. testified that she voluntarily entered into a vehicle with the understanding that she was being given a ride home. Instead, N.D. was transported to a secluded "back-alley street," where Penland, who was sitting in the back seat of the vehicle, used his penis to "rape" her vaginally. (Tr. 231.) When asked to clarify, N.D. confirmed that Penland "forced" her to engage in vaginal sex without giving her "a chance to respond." (Tr. 236.) N.D. testified that she did not consent to the sexual encounter and did not want to engage in sex with Penland. (Tr. 237, 250.) N.D., who was 19 years old and weighed 90 pounds at the time of the incident, further explained that she was outnumbered by the strange men and did not attempt to fight Penland off because she did not want to provoke him

further. (Tr. 236.) Despite her efforts to avoid a physical confrontation, however, N.D. sustained significant injuries to her person that were inconsistent with a consensual encounter. Photographs of her injuries were introduced at trial and the jury was free to make reasonable inferences from the photographic evidence. The SANE report, which was generated shortly after the incident occurred, contains further details of N.D.'s accounting of the incident. Therein, N.D. reported being "attacked" in the backseat of the vehicle by two men. The assailants removed N.D.'s clothing and forced her to engage in sexual conduct against her protests of "no," and "no stop." The report further indicates that N.D. was "afraid," and began crying "after it was over."

{¶ 47} Viewing the foregoing evidence in a light most favorable to the prosecution, we find that a rational trier of fact could conclude beyond a reasonable doubt that Penland purposely compelled N.D. to engage in sexual conduct by force or threat of force. His rape conviction is therefore supported by sufficient evidence.

{¶ 48} The first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 49} In the second assignment of error, Penland argues his conviction is against the manifest weight of the evidence. He contends that the greater weight of the evidence demonstrates that he and N.D. engaged in a consensual, albeit transactional, sexual encounter. According to Penland, the "admissions by the alleged victim, N.D., * * * render it impossible for the jury to have 'reasonably

concluded from substantial evidence that the prosecution proved' that [he] raped the alleged victim 'beyond a reasonable doubt.'"

{¶ 50} In contrast to a sufficiency argument, a manifest-weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12, citing *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 51} A trier of fact is free to believe all, some, or none of the testimony of each witness testifying at trial. *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85*; State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100. Thus, a conviction is not against the manifest weight of the evidence "solely

because the jury heard inconsistent or contradictory testimony." *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38. Finally, we note that a "conviction may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a witness' testimony be corroborated to be believed." *See, e.g., State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.).

{¶ 52} Relying on this court's decision in *State v. Roan*, 8th Dist. Cuyahoga No. 108917, 2020-Ohio-5179, Penland states that this court, sitting as the thirteenth juror, should reverse his conviction as being against the manifest weight of the evidence because N.D.'s story was inconsistent and suggested that she had consented to intimate sexual conduct in exchange for money.

{¶ 53} In *Roan*, the defendant and the victim attended a party together, where they consumed alcohol and socialized. Once the party concluded, the defendant and the victim went back to the defendant's apartment. They watched television and began "making out." *Id*. at ¶ 4. Both parties agreed that "the kissing was mutually initiated." *Id*. at ¶ 30. Thereafter, the defendant and the victim went upstairs to the defendant's bedroom. According to the victim, she immediately fell asleep while fully clothed. In the middle of the night, the victim woke up "completely naked" and the defendant was on top of her penetrating her from behind. Throughout the entire investigation, the victim consistently alleged that the

defendant penetrated her anus by force or threat of force. At trial, however, the victim testified that he penetrated her vagina, not her anus.

{¶ 54} The following morning, the victim woke up at approximately 11:00 a.m. and laid in defendant's bed until he woke up. When defendant woke up, the parties kissed, and the defendant penetrated the victim's vagina with his finger. She performed oral sex on him. Later, she asked him to drive her home and gave him her phone number.

{¶ 55} At trial, the defendant denied engaging in sexual conduct with the victim in the middle of the night. The defendant conceded that he attempted to take the victim's pants off in his bed, but that when she told him "No. Stop," he stopped. The defendant testified they both fell asleep and did not wake up until later that morning. Thus, "[the defendant] denied he was ever on top of the victim in the middle of the night, took off her clothes or pulled down her leggings, or penetrated her with his penis." *Id*. at ¶ 31. With respect to the sexual encounter the following morning, the defendant testified that when he woke up:

> [The victim] was still there. We started talking, just making small talk. We laid in bed for two and a half hours or so talking. * * * we talked about work. We talked about [how] she has pet rats, it was brought up, and she was showing me photos of them on her phone.
>
> * * *
>
> After laying there for a bit, we began kissing again, and that lasted maybe three minutes or so, at which point she then removed the covers and started performing oral sex on me.
>
> * * *

> So while she was performing oral sex on me, I put my fingers in her vagina.

*Id.* at ¶ 33. Approximately two weeks after the alleged incident, the victim filed a report with the Cleveland Police. Ultimately, the defendant was convicted of three counts of rape, felonies of the first degree.

{¶ 56} On appeal, this court found the defendant's rape convictions were against the manifest weight of the evidence. This court reasoned that

> [The victim]'s explanation of what occurred in the middle of the night, which was that [defendant] penetrated or tried to penetrate her anus, but changed to penetration of her vagina during [the victim]'s trial testimony, lacks credibility. While [the victim] testified that she was asleep, fully clothed and wrapped in a blanket, but awoke "completely naked" to [defendant] raping her, she also testified that she repeatedly continued to engage in very intimate consensual sexual activity with him.

*Id.* at ¶ 44. This court further concluded that the victim's testimony concerning the sexual activity the following morning to be "likewise problematic." While recognizing that the victim testified that she "did not want to engage in sexual conduct after waking up that morning," we found her testimony was inconsistent with her actions, including her admission that she voluntarily "kissed [the defendant] while he was digitally penetrating her vagina and that she ultimately decided to perform oral sex on him[.]" *Id.* at ¶ 39. This court further found the victim's conduct after the alleged incident to be troublesome, stating:

> Following the alleged assault, [the victim] continued to communicate with [defendant], including exchanging multiple text messages. During these text exchanges, [defendant] denied anything inappropriate occurred at his apartment; [the victim] did not dispute his account.

* * *

> Likewise, although [the victim] initially testified that she entered alcohol treatment because of the sexual assault, she later admitted — after being confronted with transcripts of her interviews with Detective Kellums — that she decided to enter the program prior to the date of the alleged assault due to a family history of alcohol abuse and an incident where she drove drunk. Finally, [the victim] admitted that her decision to report the alleged assault to the police was prompted by seeing pictures of [defendant] at a different party that were posted to social media.

*Id.* at ¶ 41, 43.

{¶ 57} Beyond the fact that Penland and the defendant in *Roan* each alleged that the sexual encounters with each respective victim were consensual, we find the circumstances presented in *Roan* to be wholly inapplicable to this case. Contrary to the facts of *Roan*, there is no evidence in this case to suggest that N.D. shared an amicable relationship with Penland before or after the incident. Additionally, and perhaps most significantly, there is no evidence in this record to suggest that N.D. engaged in consensual acts with Penland before or after the sexual encounter in the vehicle such that her allegations of sexual abuse could be deemed inconsistent with her own conduct. Finally, unlike the victim in *Roan*, N.D. has consistently alleged that she was vaginally raped, that she did not know the identity of her assailant, and that her decision to seek medical treatment and report the alleged sexual assault to the police was made at the behest of Williams and Taylor. Penland's reliance on *Roan* is misplaced.

{¶ 58} Viewing the record in its entirety, we find no basis to conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice

that the conviction must be reversed and a new trial ordered. Although N.D. was uncooperative with the police at various stages of investigation, was unable to recall certain details of the incident due to the passage of time, and had a history of engaging in sex in exchange for money, N.D. consistently stated that she was compelled to engage in vaginal sex with her assailant by force and/or the threat of force. *See State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory."); *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996).

{¶ 59} Throughout these proceedings, N.D. made no statement to the police, medical personnel, or cold-case investigators that could be construed as an indication that she consented to the sexual encounter or was otherwise financially incentivized to engage in sex with Penland. At trial, N.D. adamantly denied having sex with Penland for money. Moreover, her lifestyle choice, her failure to secure evidence, and the alleged inconsistencies in her testimony were rigorously explored by defense counsel on cross-examination. The jury, as the trier of fact, was in the best position to weigh the credibility of N.D.'s testimony and was free to believe all

or part of it. The fact that the jury rejected Penland's contention that the sexual encounter was consensual does not render the verdict against the manifest weight of the evidence. Here, it is clear from the jury's finding of not guilty on the aggravated robbery offense that it carefully considered all relevant testimony and any inconsistencies when rendering its verdict.

{¶ 60} Based on the foregoing, we find Penland's rape conviction is not against the manifest weight of the evidence. The second assignment of error is overruled.

## C. Right of Confrontation

{¶ 61} In the third assignment of error, Penland argues the trial court committed reversible error by preventing defense counsel from questioning N.D. about her failure to appear for trial in Case No. CR-19-638882-A. Penland contends that N.D.'s "failure to appear was highly relevant to [her] credibility."

{¶ 62} The general admission or exclusion of evidence rests in the sound discretion of the trial court, and a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of discretion and a showing of material prejudice. *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 139. An abuse of discretion occurs where "'the trial court's attitude, in reaching its decision, was arbitrary, unreasonable, or unconscionable.'" *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 34, quoting *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19 (plurality opinion).

{¶ 63} The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to confront the witnesses against him; however, it "guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

{¶ 64} "The Ohio Rules of Evidence clearly delineate the methods by which a party may impeach a witness' credibility." *State v. Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, ¶ 25. Evid.R. 611(B) permits cross-examination on "all relevant matters and matters affecting credibility." In turn, Evid.R. 616(A) governs methods of impeachment and provides that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Evid.R. 616(A). Evid.R. 608(B) similarly permits cross-examination of a witness concerning specific instances of conduct "if clearly probative of truthfulness or untruthfulness."

> Evid.R. 608(B) is a rule of law that "'protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged.'" *State v. Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, ¶ 26, quoting *State v. Boggs*, 63 Ohio St.3d 418, 422-23, 588 N.E.2d 813 (1995). In balancing this state interest, a defendant may question a witness on cross-examination regarding prior instances of misconduct when the questioning is "clearly probative" of the witness's character for truthfulness. *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 18; *see also State v. Widmer*, 12th Dist. Warren No. CA2011-03-027, 2012-Ohio-4342, ¶ 134.

Therefore, Evid.R. 608(B) permits cross-examination of a witness regarding specific instances of conduct that may have "a clear bearing" upon the witness's truthful character and requires a "high degree of probative value" of the prior conduct "as to the truthfulness of the witness" before the court will allow cross-examination as to the prior conduct for purposes of attacking the credibility of the witness. Staff Notes to Evid.R. 608(B). The conduct must therefore be "clearly probative of truthfulness or untruthfulness" in order to avoid unfair prejudice, confusion of the issues, and misleading of the jury. *Widmer*, citing *State v. Williams*, 1 Ohio App.3d 156, 157, 440 N.E.2d 65 (10th Dist.1981).

*State v. Jones*, 2015-Ohio-2151, 35 N.E.3d 934, ¶ 37-38 (8th Dist.).

{¶ 65} Whether evidence is probative is determined by its relevance to a matter in issue. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evid.R. 401.

"'The mere fact that testimony is logically relevant does not in all cases make it admissible. It must also be legally relevant. A fact which in connection with other facts renders probable the existence of a fact in issue may still be rejected, if in the opinion of the judge and under the circumstances of the case it is considered essentially misleading or too remote.'"

*Cleveland v. Alrefaei*, 8th Dist. Cuyahoga No. 107985, 2020-Ohio-5009, ¶ 51, quoting *State v. McDowell*, 3d Dist. Hancock No. 5-17-01, 2017-Ohio-9249, ¶ 28, quoting *Whiteman v. State*, 119 Ohio St. 285, 289, 164 N.E. 51 (1928).

{¶ 66} A trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues,

* * * or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

> "To establish a Confrontation Clause violation, the defendant must show that he was 'prohibited from engaging in otherwise appropriate cross-examination' and '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination.'" *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 64 (8th Dist.), quoting *Van Arsdall* at 680.

{¶ 67} In this case, defense counsel attempted to question N.D. on cross-examination about her failure to appear at the originally scheduled trial in 2021. At that time, the following exchange occurred on the record:

> DEFENSE COUNSEL: Ok, now you [N.D.] are aware that this case was actually set for trial the very first time last year?
>
> PROSECUTOR: Objection.
>
> TRIAL COURT: Sustained. And the jury will disregard that. We have just come out of a COVID situation here where trials have started and stopped and you will find no inference whatever. Do you understand, counsel?
>
> DEFENSE COUNSEL: I understand.
>
> TRIAL COURT: Ladies and gentleman, do you understand that?
>
> DEFENSE COUNSEL: All right. No further questions. Thank you.

(Tr. 294.)

{¶ 68} On appeal, Penland argues the trial court abused its discretion by unduly limiting cross-examination of N.D., particularly where "this case turned entirely on the credibility of Penland versus the alleged victim." Penland further

suggests that the trial court compounded the evidentiary error by suggesting that N.D.'s absence from the originally scheduled trial date was related to the COVID-19 pandemic, "despite that there was absolutely no admissible evidence in the record to warrant such a conclusion."

{¶ 69} After careful consideration, we are unable to conclude that Penland was denied his constitutional right to cross-examine N.D. fully and effectively  In this case, defense counsel was provided the unfettered opportunity to cross-examine N.D. about (1) perceived contradictions in her testimony at trial, (2) her allegedly inconsistent prior statements, (3) her history as a prostitute, and (4) her unwillingness to cooperate with the initial police investigation.  These issues were highly contested and directly related to N.D.'s conduct on the night in question and the truthfulness of her subsequent allegations to the police and medical personnel. In contrast, there is no information in this record to suggest N.D.'s failure to appear at trial in 2021 was "clearly probative" of her truthfulness or untruthfulness.  *See, e.g., United States v. Williams*, 249 Fed.Appx. 482, 483 (8th Cir.2007) (holding that prosecution witness's failure to appear for court proceedings was not probative of his truthfulness under Federal Rule of Evidence 608(b)).  Beyond mere speculation, Penland has not demonstrated that N.D.'s failure to appear in 2021 made her allegations of sexual abuse more or less probable.  We reiterate that N.D. freely admitted that she was uncooperative during the police investigation and was unresponsive at various stages of this case.  She repeatedly explained that she "wanted to move on with [her] life" and "didn't want to ruin [Penland's] life if he

matured." (Tr. 293-284.) The trial court carefully weighed the probative value of the challenged evidence and ensured that the trier of fact was presented with all relevant information relating to the credibility of N.D.'s allegations.

{¶ 70} Under the specific circumstances of this case, we find the trial court did not abuse its discretion by determining that the probative value of a posed question on cross-examination was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Additionally, we cannot say the trial court's brief reference to the scheduling complications associated with the COVID pandemic were inaccurate or otherwise prejudicial.

{¶ 71} The third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 72} In the fourth assignment of error, Penland argues defense counsel rendered ineffective assistance of counsel by (1) failing to disclose his impending suspension from the practice of law, (2) failing to file a motion to dismiss based on prejudicial preindictment delay, and (3) failing to effectively cross-examine the state's witnesses.

{¶ 73} Our review of counsel's performance is highly deferential. *State v. Korecky*, 8th Dist. Cuyahoga No. 108328, 2020-Ohio-797, ¶ 20, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we presume licensed attorneys are competent, the party claiming ineffective assistance of counsel bears the burden of proving that counsel was ineffective. *Id*., citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

{¶ 74} "To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *State v. Fisher*, 8th Dist. Cuyahoga No. 108494, 2020-Ohio-670, ¶ 18, quoting *Strickland* at 687. "The first prong of *Strickland*'s test requires the defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.*, quoting *Strickland* at 688. "*Strickland*'s second prong requires the defendant to show 'a reasonable probability that but for counsel's errors, the proceeding's result would have been different.'" *Id.*, quoting *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 25. That is, the second prong requires a determination as to whether the defense was prejudiced by counsel's ineffectiveness. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 140, citing *Strickland* at 687.

{¶ 75} "While '[t]he right to counsel is the right to the effective assistance of counsel,' 'trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel.'" *Fisher* at ¶ 19, quoting *Strickland* at 686, citing *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

### 1. Defense Counsel's Failure to Disclose his Impending Suspension from Law

{¶ 76} Penland first argues that defense counsel rendered ineffective assistance of counsel by representing him at trial despite counsel's "actual conflict of interest." Penland's position relied on the fact that defense counsel was suspended from the practice of law on March 23, 2022 — less than two weeks after

Penland's jury trial concluded. *Disciplinary Counsel v. Smith*, 168 Ohio St.3d 196, 2022-Ohio-840, 197 N.E.3d 533. Penland contends that defense counsel's representation "was motivated by collecting his fee prior to that suspension, thus elevating his own interests above his client's and creating an actual conflict." Alternatively, Penland argues defense counsel rendered ineffective assistance of counsel by failing to disclose that he was subject to pending disciplinary proceedings and potential sanctions from the Supreme Court of Ohio.

{¶ 77} In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the United States Supreme Court recognized a "narrow exception" to the *Strickland* requirements when considering whether a criminal defendant was denied his or her right to counsel under the Sixth Amendment. *See State v. Lucas*, 2020-Ohio-1602, 154 N.E.3d 262, ¶ 36 (8th Dist.). The court held that there are certain circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," such that ineffectiveness and prejudice are presumed and a denial of an accused's Sixth Amendment right to counsel is found "without inquiry into the actual conduct" of the proceedings. *Cronic* at 658-660. One such circumstance includes trial counsel's active representation of conflicting interests. *Id.* at 658-660 and fn. 25, 28.

{¶ 78} The fundamental right to counsel includes a "correlative right to representation free from conflicts of interest." *State v. Gillard*, 64 Ohio St.3d 304, 311, 595 N.E.2d 878 (1992). "Both defense counsel and the trial court are under an affirmative duty to ensure that a defendant's representation is conflict-free." *State*

*v. Dillon*, 74 Ohio St.3d 166, 167-168, 657 N.E.2d 273 (1995). "A defendant who claims he was denied the right to conflict-free counsel must demonstrate an actual conflict of interest that adversely affected his lawyer's performance." *State v. Allen*, 3d Dist. Allen No. 1-21-59, 2022-Ohio-3599, ¶ 25, citing *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 137 (3d Dist.). A possible conflict is insufficient. *State v. Getsy*, 84 Ohio St.3d 180, 187, 702 N.E.2d 866 (1998).

{¶ 79} An "actual conflict of interest," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), fn. 5. To prove an "actual conflict of interest," the defendant must show that his or her counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his [or her] representation." *Id.*, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349-350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "[W]hether an actual conflict of interest existed is a mixed question of law and fact, subject to de novo review on appeal." *Cuyler* at 342.

{¶ 80} After careful consideration, we do not find an actual or genuine conflict of interest in this case. Here, there is no dispute that defense counsel was a licensed attorney at the time of trial. He, therefore, had the right to maintain a legal practice and demand payment. Critically, the record reflects that defense counsel zealously represented Penland's interests throughout the trial proceedings and diligently pursued Penland's position that he engaged in consensual intercourse with N.D. At all critical stages of the trial, counsel's theory of defense aligned with

Penland's own testimony. Under the totality of these circumstances, we find Penland has failed to demonstrate that defense counsel's pending disciplinary process caused his interests to diverge from Penland's own interests "with respect to a material factual or legal issue or to a course of action." *See State v. Dillon*, 74 Ohio St.3d 166, 168, 657 N.E.2d 273 (1995), quoting *Cuyler* at 356, fn. 3.

{¶ 81} Moreover, although this court is troubled by defense counsel's failure to disclose relevant information to his client prior to trial, we cannot say defense counsel's lack of candor constituted ineffective assistance of counsel under *Strickland*. The Ohio Supreme Court's characterization of counsel's past representation is not lost on this court. *See Smith*, 168 Ohio St. 3d 196, 2022-Ohio-840, 197 N.E.3d 533. However, we are cognizant that the disciplinary proceedings have no direct bearing on this case. Significantly, this court "'is confined to the record on appeal and may not engage in assumptions to sustain an ineffective assistance of counsel argument.'" *State v. Zeber*, 9th Dist. Summit No. 28481, 2017-Ohio-8987, ¶ 8, quoting *State v. Higgins*, 9th Dist. Summit No. 26120, 2012-Ohio-5650, ¶ 9. In this case, beyond the specific claims that are addressed in detail below, Penland had not identified a causal connection between the unrelated disciplinary proceedings and counsel's conduct in this case. Accordingly, we find no merit to Penland's broad claim of ineffective counsel based on counsel's failure to disclose his pending suspension. Nevertheless, we find it is necessary to address Penland's remaining claims that rely on specific aspects of counsel's performance at trial.

## 2. Defense Counsel's Failure to File a Motion to Dismiss for Preindictment Delay

{¶ 82} Next, Penland argues defense counsel rendered ineffective assistance of counsel "by failing to move the trial court to dismiss the indictment against [him] for prejudicial preindictment delay." Penland contends that there is a reasonable likelihood that the motion would have been granted had it been filed because "there was a nearly 18 year delay between the date of the alleged rape and the first indictment."

{¶ 83} "[P]reindictment delay violates due process only when it is unjustifiable and causes actual prejudice." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 12. This court has "firmly established a burden-shifting framework for analyzing a due-process claim based on preindictment delay." *Id.* at ¶ 13. Pursuant to that framework, a defendant first bears the burden of presenting evidence that the preindictment delay caused actual prejudice. *Id.*, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998), and *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99. After the defendant has provided evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay. *Id.*, citing *Whiting* and *Adams*.

{¶ 84} The mere "possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice," because those are manifestations of the prejudice inherent in any delay. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 105, citing *United*

*States v. Marion*, 404 U.S. 307, 326, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 28. "Actual prejudice is determined by the circumstances of the case and evidence is considered 'as it exists when the indictment is filed' in relation to the prejudice the defendant will suffer at trial due to the delay." *State v. August*, 12th Dist. Warren No. CA2018-12-136, 2019-Ohio-4126, ¶ 12, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 7756 N.E.2d 829, ¶ 52. "The prejudice advanced must be more than merely speculative [and] must be balanced against the other evidence in order to determine whether actual prejudice will impact the defendant at trial." *August* at ¶ 12.

{¶ 85} In this case, the parties do not dispute that Penland engaged in sexual conduct with N.D. on the night in question. The sole issue before the jury was whether the encounter was consensual, as Penland suggests, or whether the elements of rape pursuant to R.C. 2907.02(A)(2) were satisfied. With respect to these issues, Penland and N.D. fully recounted their version of the incident and were fully cross-examined by opposing counsel. On appeal, Penland broadly suggests that it is "obvious that the lengthy delay between the alleged crime and the indictment substantially prejudiced [him]." However, because Penland has not identified what evidence, if any, was missing or unavailable due to the delay, we find that Penland has not demonstrated actual prejudice. Presuming defense counsel

exercised reasonable professional judgment, we find nothing in this record to suggest defense counsel did not investigate the availability of all evidence that might have bolstered Penland's defense or minimized the impact of the state's evidence. Accordingly, we cannot say defense counsel was deficient for failing to file a motion to dismiss based on preindictment delay.

### 3. Defense Counsel's Failure to Adequately Cross-Examine State Witnesses

{¶ 86} Finally, Penland argues defense counsel rendered ineffective assistance of counsel by failing to effectively cross-examine N.D. and Williams about the nature of their relationship. Relying exclusively on appellate counsel's own unsupported, and speculative interpretation of the evidence adduced at trial, Penland contends that it was unreasonable for defense counsel to not "inquire on cross-examination or offer argument as to the obvious reasonable doubt raised by the testimony showing that N.D. was a prostitute being pimped and exploited by Williams and Taylor." Penland suggests that "such questions and argument would have been of considerable value to establish why N.D. would be engaged in a sexual encounter with Mr. Penland, and why she had gotten into the strangers' car to begin with."

{¶ 87} Generally, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. Moreover, "'[a]n appellate court reviewing an

ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.'" *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. Franklin No. 04AP164, 2004-Ohio-3887, ¶ 40; *see also State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 23.

{¶ 88} After careful review of the record, we find no merit to Penland's final claim of ineffective assistance of counsel. In this case, N.D. and Williams were each cross-examined at length regarding N.D.'s living arrangement, the nature of their relationship, and their respective memories of the incident. Williams explained that N.D. moved into her home approximately one year before the incident and paid $100 per week for rent. Williams testified that she met N.D. through her children and was aware that N.D. was an erotic dancer, although Williams often advised N.D. that her "lifestyle is not the right lifestyle to be in." (Tr. 455.) N.D. offered similar testimony.

{¶ 89} Collectively, we find defense counsel's cross-examination of N.D. and Williams was satisfactory. Significantly, we find no evidentiary basis to conclude that defense counsel prejudicially rendered ineffective assistance of counsel by failing to insinuate that N.D.'s living arrangement with Williams and Taylor was purely transactional. The fact that N.D. referred to Williams and Taylor as "mommy" and "daddy," and was concerned about her ability to pay rent does not support appellate counsel's proclamation that Williams was "pimping N.D. out" — a

fact that would corroborate Penland's testimony. Rather than perpetuating unsubstantiated opinions, defense counsel made the tactical decision to focus his cross-examination on the facts in evidence. The record demonstrates that counsel's strategy was to attack N.D.'s credibility by highlighting the inconsistencies in her prior versions of the incident, her history as a prostitute, her inability to identify Penland as her assailant, and her failure to cooperate during the initial police investigation. In the absence of clear evidence that Williams was aware or somehow part of N.D.'s prior prostitution, we find it was well within defense counsel's discretion to refrain from attacking Williams's and N.D.'s credibility with conjecture or speculation.

{¶ 90} The fourth assignment of error is overruled.

### E. Prosecutorial Misconduct

{¶ 91} In the fifth assignment of error, Penland argues "the trial court erred by permitting prosecutorial misconduct in the form of an extremely inflammatory and prejudicial closing arguments."

{¶ 92} The test for prosecutorial misconduct is whether the prosecutor's "'remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d

693, 699, 664 N.E.2d 1318 (12th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 93} Generally, a prosecutor is entitled to wide latitude during closing argument. *State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 84 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). And the closing argument must be viewed in its entirety to determine whether the disputed remarks were prejudicial. "[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Gapen* at ¶ 106, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In determining whether a prosecutor's comment was prejudicial, we consider several factors (1) the nature of the remark(s), (2) whether an objection was made by counsel, (3) whether the court gave curative instructions, and (4) the general strength of the evidence against the defendant. *Harris*, citing *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

{¶ 94} "The United States Supreme Court has expressly recognized that prosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury." *State v. Fears*, 86 Ohio St.3d 329, 351, 715 N.E.2d 136 (1999) (Moyer, C.J., concurring in part and dissenting in part). Thus, while a prosecutor may strike hard blows, he or she may not strike foul ones. *Berger v.*

*United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314(1935).  As recognized by this court, such "foul blows" include the following:

> personally vouching for the credibility of a witness, launching ad hominem attacks against the defendant or [defendant's] lawyer, relying on improper evidence, relying on evidence not in the record, critically commenting on the defendant's exercise of his [or her] rights such as the right to remain silent or the right to a jury trial, and deliberately misleading the jury.

*State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2011-Ohio-2656, ¶ 7.

{¶ 95} In this case, Penland argues that the following statements during the state's closing argument amounted to prosecutorial misconduct:

> 1.  [Defense counsel], I anticipate, will get up here and victim blame.  I hate victim blaming, ladies and gentleman.  And that is just a tactic to turn your attention away from where it truly belongs.  Mr. Penland. (Tr. 672.)
>
> 2.  Mr. Penland was away from his wife, a wife he admits to cheating on and saw a chance to have sex with a stripper[.]  (Tr. 675.)
>
> 3.  Please don't let [defense counsel] get up here and distract you with insignificant details like the time that she was admitted to the hospital.  That's irrelevant.  Or that the outer clothing she wore wasn't preserved by her.  Victim blaming.  (Tr. 677.)
>
> 4.  I'm angry.  This is a child.  (Tr. 700.)
>
> 5.  I don't care.  And you shouldn't either.  You should be angry about that.  Stop blaming [N.D.] for the decision she made when she was a kid. (Tr. 700-701.)
>
> 6.  This guy's using methamphetamine in his 40s.  I don't care about what [defense counsel] thinks.  I care about facts.  (Tr. 701.)

7. This case depends on credibility. Who do you believe? And you need to use your common sense. About a year ago we tried the case of a Derrick [sic] Chauvin[.][1] (Tr. 701.)

8. [Defense counsel] got up here and blamed [N.D.] and tried to throw up a bunch of smoke and mirrors. (Tr. 707-708.)

{¶ 96} On appeal, Penland argues that the foregoing statements were rife with (1) improper appeals to the jurors' emotions, (2) inflammatory and irrelevant statements about Penland, (3) expressions of the prosecutor's own opinions, (4) calls for the jurors to become angry, and (5) disparaging comments about defense counsel. Penland contends the state's "extremely inflammatory and improper statements" deprived him of due process of law and the right to a fair and impartial jury.

{¶ 97} Initially, we are unable to conclude that the prosecutor's isolated reference to Derek Chauvin amounted to prosecutorial misconduct. While the reference to the former officer, standing alone, constituted a deliberate attempt to inflame emotion, the prosecutor was prevented from completing the analogy before her point, albeit irrelevant, could be made. Here, defense counsel raised a timely objection once Chauvin's name was mentioned, and the trial court prevented the prosecutor from completing her statement before it could be fully articulated. Under these circumstances, we find no resulting prejudice. The trial court took the

---

[1] The prosecutor's statement appears to be a reference to former Minneapolis police officer, Derek Chauvin, who was tried and convicted of murder for the killing of George Floyd.

appropriate steps to limit the state's closing argument to ensure Penland was afforded his fundamental right to a fair and impartial trial.

{¶ 98} Defense counsel did not raise timely objections to the remaining statements challenged on appeal. Thus, Penland has waived all but plain error. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 72. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error requires (1) "an error, i.e., a deviation from a legal rule"; (2) that is "plain" or "an 'obvious' defect in the trial proceedings"; and (3) that "must have affected 'substantial rights.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). For an error to have affected substantial rights, the error "must have affected the outcome of the trial." *Id*. "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it." *Id*. at ¶ 23. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶ 99} In this case, the issue of credibility predominated the parties' closing arguments. The state, for its part, emphasized the severity of N.D.'s physical and

psychological injuries, the inconsistencies in Penland's statements to the investigating detectives, and the reliability of the forensic evidence. The state further reiterated N.D.'s testimony that she felt forced to engage in sexual conduct with Penland because she was outnumbered and believed she was in danger. Although the state acknowledged that N.D. was unable to recall certain details of the "traumatic event," the prosecutor maintained that "the essence of what [N.D.] told over and over has remained consistent for 21 years. That is that she was raped that night, that she was robbed, and was left out in the cold by Mr. Penland and his friend." (Tr. 669-670.) Finally, in an effort to diminish the anticipated arguments of defense counsel, the state preemptively urged the jury to conclude that N.D.'s profession, her failure to secure her clothing, and her inability to recall the specific time she went to the hospital did not render her rape allegations "any less true." (Tr. 670, 677.)

{¶ 100} In contrast, defense counsel argued that the greater weight of the evidence supported Penland's testimony that he and N.D. had consensual sex in exchange for money. In support of his contention, defense counsel noted that N.D.'s conduct before and after the alleged incident was inconsistent with someone who was sexually assaulted and robbed. Defense counsel emphasized that N.D. (1) admitted to "soliciting for sex" during the pertinent time period, (2) "admitted to having a few drinks" on the night of the incident, (3) admitted that making money and paying rent was a priority "at that time in her life," (4) admitted that she was uncooperative and unresponsive to the initial police investigation, (5) admitted that

she failed to preserve the clothing she was wearing at the time of the incident, and (6) "admitted to going home and going to sleep after the alleged sexual assault as opposed to seeking out law enforcement officials or going to the hospital." (Tr. 682-683.) Defense counsel further discussed the alleged inconsistencies in N.D.'s version of the incident, including (1) whether there were two or three men involved in the sexual assault, (2) how she returned home after the incident, (3) who transported her to the hospital after the incident, (4) how much money was stolen from her, and (5) whether her assailant was wearing a condom.

{¶ 101} After careful consideration, we find no merit to Penland's contention that the state encouraged the jury "to pass judgment on Penland [merely] because he 'used methamphetamine in his 40's,' 'cheat[ed] on his wife,' and 'had sex with a stripper.'" In this case, Penland's infidelity and his prior drug use were facts developed over the course of trial. The prosecutor's isolated reference to these established facts was made while discussing the collective circumstances impairing Penland's credibility and his characterization of the sexual encounter. As stated, the issue of credibility was highly contested and the state was permitted to freely comment on ""what the evidence has shown and what reasonable inferences may be drawn therefrom."" *State v. Fudge*, 2018-Ohio-601, 105 N.E.3d 766, ¶ 48 (10th Dist.), quoting *State v. Muhleka*, 2d Dist. Montgomery No. 19827, 2004-Ohio-1822, ¶ 85, *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). For these same reasons, we find it was proper for the state to preemptively diminish perceived inconsistencies in N.D.'s testimony, by arguing that her inability to recall certain

details of the encounter did not negate her credibility as it relates to whether she engaged in sex in exchange for money. N.D.'s recollection and inconsistent statements were extensively explored by defense counsel on cross-examination, and the state had the right to address these issues at the time of closing arguments. The prosecutor's reference to these issues did not constitute error, plain or otherwise.

{¶ 102} Finally, while we agree that a prosecutor must refrain from denigrating defense counsel and should limit his or her closing remarks to what the evidence tends to show, we cannot say when reviewing the closing remarks as a whole, the challenged portions of the state's closing argument denied Penland a fair trial to the point that the jury would have acquitted Penland if the comments were not made. In this case, the prosecutor's use of the phrase, "victim blaming," was made in response to defense counsel's characterization of N.D.'s role in the incident and was merely an attempt to redirect the jury's attention to the evidence more favorable to the state. Similarly, the prosecutor's characterization of N.D. as a "child," and the prosecutor's insinuation that the jury should be "angry," were isolated occurrences that concerned secondary issues that did not go to the heart of the issues before the jury, namely whether the sexual encounter was consensual or whether N.D. was compelled to engage in vaginal intercourse by force or threat of force. As discussed, the jury was provided ample evidence throughout the pendency of the trial on the issue of credibility and was in the best position to resolve the competing characterizations of the sexual encounter. Under these circumstances, we are unable to conclude that the prosecutor's remarks were "so inflammatory as

to render the jury's decision a product solely of passion and prejudice." *State v. Arrone*, 2d Dist. Greene No. 2005 CA 89, 2006-Ohio-4144, ¶ 126. Accordingly, we find that Penland has failed to demonstrate the extremely high burden of demonstrating plain error.

{¶ 103} The fifth assignment of error is overruled.

{¶ 104} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
SEAN C. GALLAGHER, J., CONCUR